# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>vs.<br><br>STEVEN MICHAEL CONROY,<br>　　　　　Defendant. | Case No. 24-cr-1036-CJW<br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANT'S MOTION TO<br>SUPPRESS** |

_____

## I.    INTRODUCTION

On November 21, 2024, the Grand Jury returned an Indictment charging Defendant with one count of Possession of an Unregistered Firearm in violation of 26 U.S.C. Sections 5841, 5861(d), and 5871.  (Doc. 3.)

The matter before me is Defendant's motion to suppress.  (Doc. 28.)  The motion contained an inventory of items to be suppressed which includes: all firearms and ammunition, including, but not limited to an Anderson Manufacturing, Model AM-15, .22LR caliber firearm and a homemade silencer and marijuana dispensary bag, grinder, glass pipe, and any other drug paraphernalia.  (Doc. 28.)  This evidence was seized from Defendant's home on July 22, 2024.  (*Id*.)

The Government timely filed a response to the motion.  (Doc. 34.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on February 19, 2025.  (Doc. 41.)

At the hearing, the following Government exhibits were admitted without objection:

1.　　　Text messages between Defendant and his ex-girlfriend;

1

2.      Note on door of Defendant's residence;

3.      Supplemental report by Minnesota Officer Kate Loken;

4.      Body camera video from Minnesota Officer;

5.      Supplemental report by Minnesota Officer Kendra Heim;

6.      Complaint against Defendant filed in Winona County, Minnesota;

7.      Photograph of Defendant's residence;

8.      Aerial photograph of Defendant's residence and surrounding buildings;

9.      Body camera video from Minnesota Officer; and

10.     Department of Public Safety Threat Assessment.

The Government requested the Court take judicial notice of the testimony from the January 10, 2025, detention hearing.[1] (Doc. 22.) Defendant made no objection. At the detention hearing the Government called one of its case agents, Special Agent Robert Friend of the Bureau of Tobacco and Firearms, and Defendant called his employer Jason Haynes.

At the suppression hearing, the Government called the following witnesses from the Iowa State Patrol: Sgt. Sean Helton, Trooper Tyler Remley, and Trooper Dakota Foley. I found the witnesses at both hearings to be credible.[2]

At the hearing the following Defendant's exhibits were admitted without objection:

A.      Body camera video from Deputy Schmidt;

---

[1] There were 11 exhibits offered by the Government and admitted into evidence at the detention hearing. (Doc. 15.) The Government did not expressly request the Court take notice of these exhibits at the suppression hearing. I reviewed the exhibits from the detention hearing. There is some overlap in the two sets of exhibits, and it may be necessary to consider them to make sense of the testimony from the detention hearing. I recommend the Court only consider the detention hearing exhibits as necessary to explain the testimony of the witnesses as I have attempted to do. The suppression hearing exhibits are not otherwise helpful in resolving the issues presented by the suppression motion.

[2] I note that Agent Friend was not present for the initial entry into Defendant's residence described below, but he was present for the subsequent search. (Doc. 22 at 20.)

B.    Jackson County, Iowa search warrant dated July 21, 2024;

C.    Iowa State Patrol supplemental incident report;

D.    Jackson County, Iowa search warrant dated July 22, 2024;

E.    Search warrant return – property list;

F.    Report by Deputy Schmidt; and

G.    Jackson County, Iowa population data.

At the conclusion of the suppression hearing, the parties were given the opportunity to submit post-hearing supplemental briefs.    Neither party filed a supplemental brief.  While Defendant called no witnesses at the suppression hearing, he did call Jason Haynes at the detention hearing.  Mr. Haynes is defendant's employer and primary owner of Defendant's residence.  Because the Court was asked to take notice of the transcript of the detention hearing, I note that I found Agent Friend's and Mr. Haynes's testimony credible.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

On July 19, 2024, Defendant attended a hearing in Iowa with his ex-girlfriend, B.M., regarding their shared child.  (Doc. 22 at 5.)  Defendant became upset about the outcome of the hearing.  After the hearing, B.M. returned to her home in Minnesota where she began to receive threatening voice and text messages from Defendant. (*Id.*, Def. Ex. B.)  In these messages, Defendant repeatedly mentioned harming himself and others—including both B.M. and law enforcement officers.  (Gov. Ex. 1 at 3-8.) Concerned for her safety, B.M. reported the threats to local law enforcement and requested an officer to respond to her residence.  (Gov. Ex. 3 at 1.)  While the officer was present at B.M.'s residence, Defendant's sister called B.M. and informed her that Defendant was driving to Minnesota.  (*Id.* at 1.)

Jackson County, Iowa Deputy Sheriff Melissa Schmidt attempted to locate Defendant at his residence in rural La Motte, Iowa. (Def. Ex. F at 1.) Upon arrival, Officer Schmidt did not find Defendant but discovered a note taped to the front door stating: "I've gone to Minnesota to speed up the legal process. I'm sorry to everyone I'm letting down but this is what was always going to happen. Why wait longer than necessary." (Doc. 22 at 7; Def. Ex. F. at 1; Gov Ex. 2; Gov. Ex. 9.) Deputy Schmidt also shined a light into the window of the residence and observed military-style bags on Defendant's kitchen table and several long guns hanging from the wall. (Def. Ex. A.) Around this time, a Minnesota law enforcement officer contacted Defendant by phone. (Gov. Ex. 4.) During the conversation, Defendant stated that he wanted B.M. to witness his suicide by law enforcement. (*Id.*) Defendant eventually returned to his residence after receiving a call from his employer Jayson Haynes—who had been contacted by the Jackson County Sheriff's Department about the situation. (Doc. 22 at 39-40.)

On July 20, 2024, an arrest warrant was issued for Defendant in Winona County Minnesota based on the threatening content in the messages to B.M. (Doc. 22 at 8; Gov. Ex. 5 & 6.) Following this, on July 21, 2024, Deputy Schmidt authored and obtained a search warrant authorizing officers to search the Defendant's residence and the neighboring property where he was known to work. (Def. Ex. B.) The search warrant did not authorize the search for or seizure of any property, evidence, or contraband. The warrant merely authorized law enforcement to conduct the search to locate Defendant and effect the arrest of Defendant pursuant to the Minnesota warrant. (Doc. 22 at 8; Def. Ex. B.)

It is not clear what information the Jackson County Sheriff's Department learned from Mr. Haynes, but the warrant identified Defendant as the secondary owner of the property with Mr. Haynes as the primary owner. (Def. Ex. B at 1-8.) Moreover, the warrant noted that Defendant's place of employment, Midwest Legacy Beef, adjoined the

4

residential property, which is owned by "his friend," presumably Mr. Haynes. (*Id.* at 7.)

The warrant affidavit noted Defendant's possession of numerous firearms, tactical gear, body armor, the fact that he carries a pistol at all times, as well as his involvement in "long gun shooting sports." (Def. Ex. B at 4.) The warrant described the affiant's training and experience that "it is not uncommon for persons who have displayed weapons and military type equipment in a criminal act to barricade doors and windows in an attempt to evade arrest." (*Id.*)

On July 20, 2024, Sgt. Sean Helton with the Iowa State Patrol was asked if the Iowa State Patrol Tactical Team would be able to assist with the warrant. (Def. Ex. C at 1.) Sgt. Helton's report indicates the Jackson County Sheriff told him about Defendant's threats of violence, potential for "suicide by cop," and the presence of long guns in Defendant's residence. After reviewing the events of July 19 and conducting a "Threat Assessment" of Defendant and his property, Sgt. Helton determined that a mandatory activation of the Tactical Team was required. (Def. Ex. C at 1; Gov. Ex. 10 at 3; Helton Hr'g Test. at 7-17.)[3] The Threat Assessment noted "assault," "resisting

---

[3] Sergeant Helton explained that a "Threat Assessment" is:

> "used for the Tactical Operations Unit in order to assess how serious [a] suspect or situation may be. It takes into consideration the criminal history and any background information, as far as weapons, weapons permits, any felonies on their criminal history. . . [and is used to] gauge the level of threat that [the tactical team] may come into contact with during a tactical operation. It's used by [Iowa State Patrol Tactical Team] command staff to determine if they will approve the operation or not."

(Helton Hr'g Test. at 7-17.) The Assessment assigns different "points" to different circumstances and if a situation reaches the threshold of 25 "points" Tactical Team activation becomes mandatory. (Gov. Ex. 10 at 3; Helton Hr'g Test. at 16.) Here, Helton found that due to Defendant's situation, the threat assessment reached 26 "points" based on Defendant's

5

arrest," "assault on a peace officer," mental instability, and "military/police background" under suspect assessment as reasons that increased the safety risk.

On the morning of July 22, 2024, Sgt. Helton oversaw the execution of the warrant. (Helton Hr'g Test. at 30-31.) The regular Tactical Team leader was absent, so Sgt. Helton stepped into the leadership role. Prior to the execution of the warrant, a briefing was conducted at the Maquoketa Fire Department to discuss safety and "to know exactly what we know and why we're here to serve this warrant." (*Id.* at 30.)

At the briefing, the participants discussed the threatening messages Defendant had sent his ex-girlfriend a few days previously. The possibility of firearms being present was discussed at the briefing. Some information regarding Defendant's criminal history was available to the search team. Prior to execution of the warrant, Sgt. Helton deployed a scout/sniper team. The Jackson County Sheriff's office was also involved in the search, and it deployed a drone at the site.

The Tactical Team arrived at Defendant's residence around 6:10 a.m. (Def. Ex. C at 1.) The site of the search is depicted in a Google Maps photo shown in Exhibit 7. Sgt. Helton testified he had multiple concerns about the scene. Among them was the proximity of Defendant's residence to his place of work which meant other people could be present in the residence. Sgt. Helton was also concerned about the topography, in that anyone in the house would have the tactical advantage of the high ground. Sgt. Helton's team was not able to park at the desired angle on the hill. (Helton Hr'g Test. at 34-35.) Sgt. Helton identified himself, announced the warrant, and began giving commands over the armored rescue vehicle public address system asking Defendant to exit his residence with his hands raised. (*Id.* at 35-36.) Defendant appeared in the upstairs window and then later appeared in a downstairs window after further command.

"Suspect Assessment," "Offense Assessment," and "Weapon Assessment" sections. (Gov. Ex. 10 at 1-2.) Thus, Tactical Team activation was mandatory. (Helton Hr'g Test. at 16.)

(*Id.* at 36-37.) When Defendant stated that he wanted to see the warrant, Sgt. Helton responded that he could see it once he came out of the residence empty handed. (*Id.* at 39.) After this exchange, Defendant exited the residence with his hands up. Defendant was placed into custody outside his residence at 6:13 a.m. (*Id.* at 40; Def. Ex. C at 1.) Once Defendant was placed into custody, he stated that nobody else was in the residence with him. (*Id.*)

Sgt. Helton remained concerned that there may nevertheless be another person inside the residence due to Defendant's residence being owned by his employer, Mr. Haynes, the fact that Defendant's place of work was next to the property, intelligence alerting his team of the weapons inside the residence, and Defendant's criminal history background. (*Id.* at 42-45.)

After Defendant was apprehended, the Tactical Team, consisting of 8-12 members of the Iowa State Patrol Tactical Unit, entered Defendant's residence and began a protective sweep at 6:17 a.m. (*Id.* at 42; Def. Ex. C.) Trooper Tyler Remley was the first person to enter the residence carrying a ballistic shield for protection against gunfire. (Remley Hr'g Test. at 88.) The sweep lasted approximately seven minutes. (Helton Hr'g Test. at 52.) No other individuals were found inside. (Def. Ex. C at 4.) Trooper Remley observed numerous firearms, including a rifle with what appeared to be a homemade suppressor made from a lead pipe in Defendant's bedroom closet. (Remley Hr'g Test. at 99-100; Def. Ex. C at 3.)

Based on this discovery, officers obtained a subsequent search warrant authorizing the seizure of firearms inside Defendant's residence. (Doc. 22 at 10; Def. Ex. D.) Upon executing this warrant, officers recovered multiple firearms, including the rifle with the suspected homemade suppressor, which was not registered to Defendant in the National Firearms Registration and Transfer record. (Doc. 22 at 12-13.) Additionally, officers found marijuana paraphernalia, including a grinder, glass pipe, and commercial

7

packaging. (Doc. 22 at 11; Def. Ex. E.) The evidence obtained during this second search is the subject of Defendant's motion to suppress.

At the hearing it became apparent that the Tactical Team misunderstood the nature of the warrant. Sgt. Helton correctly believed that the Tactical Team was involved in executing a search warrant. However, he did not understand that the only objective of the search was to locate Defendant for the purpose of executing the arrest warrant. (Helton Hr'g Test. at 27-28.) Attachment A to the warrant that listed the property to be seized states, "Not requesting any property to be seized. Only interested in locating Steven M. Conroy to execute the arrest warrant." (Doc. 29-2 at 2.) Sgt. Helton believed that the warrant was "all-encompassing." (*Id.* at 27-28.) More specifically, Sgt. Helton believed that his task was to clear the residence. He believed that following the sweep, the Jackson County Sheriff's Department would make any additional search for whatever they were authorized to search for. (*Id.* at 76-77.)

Trooper Foley, the second Trooper to enter the residence essentially confirmed this misunderstanding of the nature of the warrant. Trooper Foley testified that the decision to make a protective sweep was made during the briefing. Once Defendant emerged from the residence and was taken into custody, there was no discussion to revisit the necessity of a protective sweep. Even if Defendant had been sitting on the porch waiting for law enforcement, Trooper Foley understood that the Tactical Team would make entry into the residence. It does not appear that there was any discussion about whether to call off the protective sweep after Defendant emerged from the residence as the decision to make such a sweep had already been made. (Foley Hr'g Test. at 133.)

### III. DISCUSSION

#### A. The Parties' Arguments

Defendant seeks the suppression of the following items:

1.  All firearms and ammunition seized from Mr. Conroy's residence on July 22, 2024, including, but not limited to an Anderson Manufacturing, Model AM-15, .22LR caliber firearm and a homemade silencer[; and]

2.  Marijuana dispensary bag, grinder, glass pipe, and any other drug paraphernalia seized from Mr. Conroy's residence on July 22, 2024

(Doc. 28.)

Defendant argues that law enforcement exceeded the scope of the original search warrant when they entered his home to conduct a protective sweep after arresting him. (Doc. 29 at 4-5.)  Defendant contends that the warrant was limited to locating and arresting him, and that any entry beyond that purpose was unlawful.  (*Id.*)  By entering the residence without further justification, Defendant asserts that law enforcement violated his Fourth Amendment rights.  (*Id.*)  Consequently, he argues that the evidence obtained as a result of the protective sweep should be suppressed.  (*Id.*)

Defendant argues that if the information gleaned by law enforcement during the protective sweep is redacted from the second warrant application, then the second warrant lacks probable cause, and the evidence seized from his home must be suppressed. Finally, Defendant argues that the *Leon* good faith exception does not apply.  Defendant asserts that the second warrant application was misleading, particularly in its failure to mention Defendant was apprehended outside his residence before the protective search was commenced.  Defendant further contends the Deputy Schmidt and Sheriff Kilburg, who executed the second warrant were present for the first search and knew entry into Defendant's home after he was arrested exceeded its scope.  Therefore, Defendant concludes, the officers executing the second warrant could not have believed it was lawful.

The Government opposes suppression, arguing that the Iowa State Patrol Tactical Team observed the firearm at issue in plain view during a lawful protective sweep.  (Doc.

9

34 at 7-20.)   The Government claims that the protective sweep was conducted as a necessary safety precaution.  (*Id.* at 17.)   The Government asserts that the protective sweep was lawful and justified based on several factors:

> 1. The Tactical Team's understanding that firearms and potentially other dangerous weapons could have been present in the residence at the time of the warrant's execution which would have given anyone remaining in the residence access to weapons with which to attack officers.  (Doc. 34-1 at 17.)

> 2.  The Tactical Teams knowledge of Defendant's background and threats to his girlfriend a few days prior to the warrant execution.  (*Id.*)

> 3. The delay between Defendant's appearance in the upstairs window and his eventual opening of the front door, which could have allowed others inside to hide.

> 4. Uncertainty regarding the number of individuals in the home, given that another person was listed as the primary owner of the property and that Defendant's place of employment adjoined the property.  (*Id.*)  Associated with this concern was the elapse of time from the threats on B.M. giving time for Defendant to have others come to the residence.

> 5.  Law enforcement's assessment that they were vulnerable to an attack from the inside.

The Government argues that the sweep was quick, officers accessed only places where a person could be hiding, and they observed in plain view a suspected homemade silencer whose incriminating nature was apparent.

## B.     The Protective Sweep

It is well established that law enforcement may perform a protective sweep as a safety precaution.  This exception to the search warrant requirement, however, is not without limit.  "Upon legally entering a residence, officers have the authority to conduct

a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *United States v. Walsh,* 299 F.3d 729, 733 (8th Cir. 2002)). "Without a warrant, probable cause, or reasonable suspicion, officers may 'look in closets and other spaces, immediately adjoining the place of arrest' to ensure officer safety." *United States v. Aguilar*, 743 F.3d 1144, 1147 (8th Cir. 2014) (citing *Buie*, 494 U.S. at 334). "A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger." *Pruneda*, 518 F.3d at 603. "A protective sweep is proper even if the potential individual being searched for is unidentified." *United States v. Hatcher*, 441 F.Supp.3d 723, 740-41 (N.D. Iowa 2020) (citing *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)).

Thus, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (quoting *Buie*, 494 U.S. at 327). "The government bears the burden of proving that [the protective sweep] exception to the search warrant requirement applies." *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009).

The instant case presents a slightly more difficult issue than a routine protective sweep because of its timing and location. Had officers entered Defendant's home to effect his arrest as permitted by the warrant rather than wait for him to emerge, it is unlikely a protective sweep would be controversial. Here, however, Defendant had already emerged from his residence and was in law enforcement custody when they entered the residence for their protective sweep.

*Alatorre* also involved a protective search of a defendant's residence. There, too, the arrest warrant was executed immediately outside the residence. In *Alaltorre,* the arrest warrant arose from an assault. Prior to the arrest warrant execution, law enforcement decided to use a ballistic shield because of the risk to their safety based upon the defendant's criminal history and use of firearms. After officers surrounded the house, they observed movement and heard voices inside, experienced a significant delay before the door was opened, and knew from the defendant's record that firearms were likely present. *Alaltorre*, 863 F.3d at 811. On those "specific and articulable facts," the Eighth Circuit held that a limited, two-minute sweep, even though the arrestee had already been handcuffed on the porch, was justified to dispel the reasonable possibility that an unseen accomplice might attack. *Id.* at 814-16.

Those same considerations, and several others, were present here. Law enforcement was aware that Defendant kept multiple firearms and tactical gear inside his residence, had threatened of "suicide by cop," and had issued violent threats toward both his former partner and law enforcement personnel. When the Tactical Team arrived, Defendant twice appeared at separate windows, refused initial commands, and demanded to see the warrant before emerging outside the residence.[4] This conduct could have afforded ample time for anyone inside the residence to arm or conceal themselves. Moreover, the property's ownership and layout heightened the risk to law enforcement. Additionally, the residence was on the high ground, was somehow connected to Defendant's employer, adjoined his workplace, and was a two-story rural structure with multiple points of egress, making it reasonable to suspect additional occupants and present

---

[4] This implies no criticism of Defendant's request to see the warrant. Nevertheless, law enforcement is entitled to consider any delay concomitant to the request in assessing the risk presented.

risk to those outside. In short, the objective dangers identified in *Alatorre*, uncertain occupancy, known weapons, and officer exposure, were present here.

The Southern District of Iowa's recent decision in *United States v. Ruiz* reinforces these points. 728 F.Supp.3d 977 (S.D. Iowa 2024). There, officers executing a parole warrant observed subjects retreat inside a parolee's home, detained the defendant outside, and conducted a six-minute sweep that uncovered narcotics in plain view. *Id.* at 981-982. Chief Judge Rose, relying on *Alatorre*, concluded that a brief, person-focused protective sweep is permissible even after the arrestee is secured when officered heard movement inconsistent with the arrestee's assurances, knew weapons or contraband may be present, and remained vulnerable on the threshold. *Id.* at 882-84. Defendant offers no attempt to distinguish either precedent. The objective dangers identified in *Alatorre* and *Ruiz*, uncertain occupancy, known weapons, and officer exposure were at least as acute here.

In the case at bar, law enforcement might not have observed quite so much at the scene that raised concerns about the need for a protective search as officers did in *Alatorre* or *Ruiz*. They did not see, for example, anyone fleeing from the scene or hear movement. Here, however, in addition to what law enforcement observed at the residence, they were aware of other information about Defendant's criminal history, threats of "suicide by cop," threats on B.M., the possibility of the "primary owner" being present, to make worry about a possible ambush a legitimate concern even after Defendant was detained.

I recommend that the Court conclude that the protective sweep conducted by the Iowa State Patrol Tactical Team was supported by specific and articulable facts and was lawful under the Fourth Amendment. While Defendant's argument focuses primarily on the scope of the search warrant, asserting that it authorized only the Defendant's apprehension and did not extend to further search, the Court's analysis is not limited to the language of the warrant. Rather, as stated above, the Fourth Amendment permits

law enforcement officers to conduct a protective sweep of a residence incident to an arrest when they possess a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual who may pose a danger. *Pruneda*, 518 F.3d at 603 (citing *Buie*, 494 U.S. at 334); *Walsh,* 299 F.3d at 733).

The record establishes that law enforcement's belief that additional individuals might be present in the residence and pose a threat was based on a number of articulable facts. Officers were aware of Defendant's recent and credible threats of violence, including threats toward law enforcement personnel. (Helton Hr'g Test. at 21-22.) Defendant's communications indicated an intent to engage in self-harm and to provoke a violent encounter with officers. (*Id.*) Officers were also aware Defendant's residence contained multiple firearms and weapons. (*Id.* at 45-46.) Further, Defendant's place of employment was located adjoined to the residence, which, along with the ownership of the property by a third party, is reasonable to have created uncertainty as to whether other individuals could have been present inside the residence. (Def. Ex. B at 1-8.)

Moreover, the Threat Assessment process, as described in the testimony of Sgt. Helton and reflected in the admitted exhibits, assigned specific point values to various factors relating to Defendant's history, prior threats, access to weapons, location of Defendant's residence, and identification of Defendant as the secondary owner of the property. (Gov. Ex. 10 at 3; Helton Hr'g Test. at 16.) Defendant's assessment reached a total of 26 points, exceeding the threshold required for mandatory activation of the Tactical Team. (Helton Hr'g Test. at 16.) This objective evaluation of threat level further supports law enforcement's reasonable belief that the residence could have harbored another individual who posed a danger to officer safety.

## C.    *Mistake Regarding Scope of the Search Warrant*

At the hearing, Sgt. Helton testified that he understood the warrant to authorize an "all-encompassing search . . . for the entire property." (Helton Hr'g Test. at 76.)

14

He understood his Tactical Team's role was to make the area secure for other investigators to follow up with a search for anything the warrant authorized them to seize. (*Id.* at 77.) At the time of the search warrant's execution, Sgt. Helton was not aware that the only purpose authorized by the search warrant was to locate and execute the arrest warrant. (*Id.* at 28.) Trooper Dakota Foley was assigned to entry team and to operate the "Halligan tool" to pry open the door if necessary. (Foley Hr'g Test. at 112.) Trooper Foley testified that he understood that the Tactical Team would conduct a protective sweep of the residence after Defendant's apprehension, regardless of the circumstances. (*Id.* at 132-34).

Here, I must also consider what affect, if any, the Tactical Team's misunderstanding of the nature of their assignment has on this determination. As stated above, Sgt. Helton thought his team was required to sweep the house prior to a search for property by Jackson County Sheriff's Deputies. This understanding is contrary to the language of the search warrant. I start by observing that, if the warrant had authorized a further search for property, the protective sweep would undoubtedly be justified based on the circumstances presented and the geographic scope of the warrant itself. In other words, it is not remarkable that law enforcement would start with a protective sweep of an area authorized to be searched. I note this to underscore the absence of any bad faith on part of the Tactical Team. They entered only areas covered by the warrant. Moreover, there is no evidence that law enforcement fabricated any safety concerns as a pretext to enter areas they were not authorized to enter.

For the reasons set forth above, I recommend the Court find that the protective sweep is justified based on what was previously known to law enforcement and what they encountered at the scene. The question becomes whether the Tactical Team's misunderstanding of the assignment and the fact it had decided to make the sweep even before arriving on the scene significantly erodes the basis for the search. I recommend

the Court find that it does not erode the basis for the search. Again, the knowledge law enforcement had about long guns in the residence, Defendant's agitated mental state, his military background, and the proximity of his place of employment all raise concerns not just about the safety of officers who would enter the residence, but also of officers outside until the operation was complete. At the scene, Defendant's delay in emerging raised additional concerns about the possibility of an attack on law enforcement from within the residence. Even if the execution could be completed relatively quickly, Sgt. Helton had concern about the vulnerability of law enforcement because anyone inside would have the high ground and may have firearms to attack law enforcement officers who had not been able to place their vehicles in an ideal defensive position.

Finally, the fact that the decision to sweep was predetermined based on a faulty assumption about the nature of the task, does not undermine the assessment that the protective sweep was necessary, even if justified with hindsight. Neither party has cited any authority to the contrary.

### D.  Conclusion Regarding Protective Sweep

While Defendant asserts that the limited scope of the search warrant precluded any additional entry or search, even assuming the warrant itself was limited solely to Defendant's apprehension, the protective sweep was conducted pursuant to independent and well-established Fourth Amendment authority, grounded in officer safety concerns and articulable facts. The protective sweep itself was within the constitutional boundaries recognized by the Supreme Court and the Eighth Circuit. The sweep lasted approximately seven minutes and was confined to areas where an individual could have been hiding.[5]  Given these circumstances, the protective sweep of Defendant's residence

---

[5] Defendant raised no issue about the length of time it took to complete the sweep or the areas subject to the sweep.

was lawful. As such, the evidence at issue found in plain view was not a product of an unlawful sweep.

Because the protective sweep was not unlawful, the observation of the homemade suppressor in plain view was not unlawful. Thus, the items seized during execution of the second warrant arising from that observation are not the fruit of the poisonous tree and need not necessarily be suppressed because law enforcement was unlawfully present when the observations were made. However, law enforcement used their observation of the evidence to obtain a second search warrant to seize it. Law enforcement had an obligation to be truthful in seeking the second warrant, as discussed below.

## E.    *The Second Warrant Application*

If the Court disagrees with my conclusion and decides the protective sweep was unlawful, it may choose to wrestle with whether the subsequent search may be lawful under *Leon's* good faith exception. On the other hand, the Court may choose not to address whether any *Leon* exception saves the second warrant[6] and merely find the

---

[6] I recommend the Court conclude that *Leon* is not applicable to the first search warrant, i.e., the warrant that merely authorized the search to locate Defendant. *Leon* is inapplicable because it shields only "objectively reasonable reliance" on a presumptively valid, yet ultimately invalid, warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). *Leon* itself emphasized that its holding "assumes of course that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." *Id*. at 918 n.19. Where the defect arises from how a valid warrant is executed, rather than an issue with the warrant's issuance, the good faith doctrine offers no protection. *See United States v. Rowland*, 145 F.3d 1194, 1208 n. 10 (10th Cir.1998) ("The Leon *good* faith exception will not save an improperly executed warrant."). Indeed, *Leon* does not excuse officers who exceed the scope of a valid warrant or otherwise act unreasonably in its execution. *See United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) (observing that "it is apparent that the problem lies in the execution, and not the constitutionality, of the search warrant," so Leon does not apply). In short, there is no indication that the search warrant to find and arrest Defendant was facially invalid. Rather, Defendant's challenge is directed to the law enforcement officers' alleged decision to enter the residence and conduct a protective sweep that exceeded the scope of the warrant and was not independently justified. Because that is an execution-based challenge to an otherwise valid warrant, *Leon* does not apply to the first search warrant. If the Court were to

17

Government waived the issue because the Government did not address *Leon* in its resistance despite Defendant's argument.

Arguments about the content of the of the second warrant application are not the product of robust briefing and perhaps I am in danger of reading more (or even less) into the parties' briefs than they have asserted. Defendant argues that the *Leon* exception does not apply to the second warrant because it was misleading, if technically correct, where it states, "Conroy was located inside his residence located at 518 Elm Street, La Motte, Iowa, in Jackson County. When officers were inside the home clearing it, they observed a homemade illegal rifle." (Def. Ex. D at 4.) Defendant argues that if the issuing judge had been told Defendant was arrested outside, the judge would have questioned the lawfulness of the search that uncovered the illegal rifle and suppressor. Thus, Defendant certainly called the second warrant application out for misleading the issuing judge about where Defendant was apprehended and the protective sweep. (Doc. 29 at 7-8.) Defendant does not, however, cite *Franks v. Delaware*, 438 U.S. 154 (1978) or other authority to explain what the Court should do in response to the allegedly misleading information.

As I stated, the Government has not mentioned *Leon* and evidently intends to stand (or fall) on the legality of the protective sweep. Nevertheless, the Government has not responded to Defendant's argument that the second search warrant application was misleading in describing the execution of the first search warrant. The Government focuses exclusively on whether the protective sweep was justified and concludes "[t]he discovery of the rifle with the suspected homemade silencer also provided probable cause to obtain the search warrant." (Doc. 34-1 at 19-20.) In other words, the Government

_____

find the protective sweep and resulting observations unlawful, *Leon* would not cure such illegality. Accordingly, even if the Government were to have invoked *Leon* in its resistance, that exception would not apply to the officers' alleged improper execution of a valid search warrant to find and arrest Defendant.

defends the lawfulness of the protective search without addressing Defendant's contention about how the information derived from the search was presented in the second warrant application. While the Court may be justified in deeming the argument waived, I find it appropriate to address the merits of the argument. As discussed below, a search warrant is presumptively valid and, if there is no exception as articulated in *Leon*, it should be upheld.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4)

when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).

Here, Defendant appears to be arguing that the affidavit in support of the second warrant falls within the first category because it was misleading. Under the Fourth Amendment, a showing of probable cause is required before the issuance of a search warrant. *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her]. . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Where an issuing judge's probable cause determination was premised on an affidavit containing false or omitted statements, the resulting search warrant may be invalid if the defendant can prove by a preponderance of evidence '(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading . . . and (2) that the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.'" *Id.* (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)). Even though the parties have not mentioned *Franks*, whether Defendant is entitled to a hearing on the issue raised and/or resolve the issue raised, he must make a substantial preliminary showing under the framework set forth in *Franks v. Delaware*, 438 U.S. 154 (1978). *See id.* at 557-58 (setting forth the *Franks* framework for resolving the issue of a misleading search warrant affidavit).

Under *Franks*, an affidavit in support of a search warrant is presumed valid. 438 U.S. at 171*; see also United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022); *United States v. Hollis*, 245 F.3d 671, 673 (8th Cir. 2001). A defendant is entitled to a hearing

under *Franks* when he or she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56; *see also United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) ("To receive a *Franks* hearing, 'a defendant must make a substantial preliminary showing that there was an intentional or reckless' omission from a warrant affidavit that 'was necessary to the finding of probable cause.'") (Quoting *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008)). "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *Hansen*, 27 F.4th at 637 (quoting *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015)). Indeed, "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)).

To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from [an] omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id.* (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

If a defendant can make the requisite preliminary showing to warrant a *Franks* hearing, then at the *Franks* hearing, the defendant must establish: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining contents is insufficient to establish probable cause." *Conant*, 799 F.3d at 1199 (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). A similar analysis is employed for omissions. "The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774). "[N]egligence or innocent mistake is not enough to establish a *Franks* violation." *Freeman*, 625 F.3d at 1050-51 (quoting *United States v. Butler*, 594 F.3d 955, 961(8th Cir. 2010)). Only if the defendant can meet this burden will the "search warrant . . . be voided [under *Franks*] and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Butler*, 594 F.3d at 961.

Here it is far from clear that Defendant would have been entitled to a *Franks* hearing, had he requested one. The best Defendant might have established is that Deputy Schmidt knew that the first search warrant was executed after the arrest was complete. I cannot, on the record before me, conclude what Defendant calls a "significant omission" (i.e., the timing and location of the arrest) was made knowingly and intentionally, or with reckless disregard for the truth. Moreover, if the Court reaches the second part of the analysis and examines the repaired affidavit, probable cause still exists. Defendant suggests including the information about the location of the arrest would have played out as follows,

> Had Deputy Schmidt stated in the second warrant affidavit that Mr. Conroy was arrested outside of his home (which fulfilled the point of the first warrant), and then the officers went into the home anyway, the issuing

22

judge likely would have questioned whether the officers were acting lawfully when they observed the illegal rifle and suppressor.

(Doc. 29 at 7.) I conclude that merely supplying the location of Defendant's arrest is unlikely to have been the entirety of the information the affiant would have supplied if questioned by the issuing judge. The affidavit does mention "clearing the residence" even if it does not mention all the concerns that prompted the protective sweep. Thus, if supplemented with the location of the arrest and the basis for the protective sweep[7], the affidavit would support a finding of probable cause. Therefore, I recommend the Court conclude that the contents of the affidavit as properly considered under *Franks* would still support probable cause. I also conclude that the affidavit does not contain "a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge" and, therefore, the *Leon* good faith exception would apply. Thus, if the Court chooses to reach the *Leon* issue, as I have, I recommend the Court conclude law enforcement reliance on the validity of the second search warrant was objectively reasonable and the evidence seized pursuant to it need not be suppressed.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 28.)**

---

[7] What basis for the protective sweep Deputy Schmidt might have offered is unclear because she did not testify. It is not clear what Deputy Schmidt knew of the Tactical Team's rationale for conducting the protective sweep once Defendant was in custody. In other words, the Court does not know if her fuller account of the sweep to the issuing judge would have included merely the Tactical Team's explanation of on-going perceived threats or if it would have explained the Tactical Team's misunderstanding. I will not presume Deputy Schmidt would have been untruthful or uncandid. More importantly, given the state of the record, I cannot conclude that whatever events she knew and described would have destroyed probable cause. For the reasons set forth in section ***III(A)*** above, I conclude there is a truthful explanation of the events that supports probable cause.

23

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 18th day of April, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa