# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN MICHAEL CONROY, <br><br> Defendant. | No. 24-CR-1036-CJW-MAR <br><br><br> **ORDER** |

___

## I.   INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 43) by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending the Court deny defendant's Motion to Suppress (Doc. 28). Defendant is currently charged with one count of Possession of an Unregistered Firearm in violation of Title 26, United States Code, Sections 5841, 5861(d), and 5871. (Doc. 3).

On February 4, 2025, defendant filed a motion to suppress the following items seized during a search of his home on July 22, 2024: all firearms and ammunition, including but not limited to an Anderson Manufacturing, Model AM-15, .22LR caliber firearm and a homemade silencer, and a marijuana dispensary bag, grinder, and any other drug paraphernalia. (Doc. 28). The government timely filed a resistance. (Doc. 34). On February 19, 2025, Judge Roberts held a hearing on the motion. (Doc. 41). On April 18, 2025, Judge Roberts issued his R&R, which recommends that the Court deny defendant's motion. (Doc. 43). On May 1, 2025, defendant timely filed an Objection to the R&R. (Doc. 46). For the following reasons, defendant's Objection (Doc. 46) is **overruled**, the R&R (Doc. 43) is **adopted**, and defendant's Motion to Suppress (Doc. 28) is **denied**.

## II.     STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of the Report and Recommendation de novo.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect

2

to review an R&R under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

## III. DISCUSSION

Defendant does not object to Judge Roberts' account of the relevant facts, only his legal analyses and conclusions based on those facts. The Court therefore incorporates Judge Roberts' findings of facts in the R&R as if fully set forth here. (Doc. 43, at 3–8). When relevant, the Court will rely on and discuss the facts in conjunction with its de novo review of the legal issues.

### A. *The Protective Sweep Exception*

Defendant objects to Judge Roberts' conclusion that under the "protective sweep" exception to the Fourth Amendment's prohibition against warrantless searches, law enforcement officers were permitted to enter and conduct their sweep of defendant's residence incident to his arrest—even though defendant was already detained outside the residence—because they possessed a reasonable belief, based on specific and articulable facts, that the areas to be swept harbored an individual who may pose a danger. (Doc. 46, at 1–6); *see also* (Doc. 43, at 10–14).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). One such exception is the "protective sweep" by police officers, which involves "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). A protective sweep is permitted only if "the searching officer possessed a *reasonable belief* based on *specific and articulable facts* which, taken together with the *rational inferences* from those facts, reasonably warranted the officer in

3

believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (cleaned up) (emphases in original).

"[A] protective sweep may not be conducted as a matter of course," but rather must be justified on an individualized basis. *United States v. Williams*, 577 F.3d 878, 881 n.3 (8th Cir. 2009) (citing *United States v. Davis*, 471 F.3d 938, 946 n.5 (8th Cir. 2006)). "A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008). "Protective sweeps are authorized for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest but not for weapons or contraband." *United States v. Ruiz*, 728 F. Supp. 3d 977, 982 (S.D. Iowa 2024) (cleaned up); *see also United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005). Officers may seize, however, "any 'immediately apparent' contraband that is 'in plain view' while performing the sweep." *United States v. Thompson*, 6 F.4th 789, 793 (8th Cir. 2021) (quoting *Alatorre*, 863 F.3d at 815–16); *see also Pruneda*, 518 F.3d at 603–04 (citing *United States v. Khabeer*, 410 F.3d 477, 482 (8th Cir. 2005)).

The Eighth Circuit and other federal circuits have upheld protective sweeps of a defendant's residence conducted after the defendant was already arrested outside the residence. *Alatorre*, 863 F.3d at 814 (citing *United States v. Cavely*, 318 F.3d 987, 995–96 (10th Cir. 2003); and *United States v. Hoyos*, 892 F.2d 1387, 1396–97 (9th Cir. 1989), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc)). In *Alatorre*, police officers and United States Marshals (collectively, "officers") planned to execute a warrant for the defendant's arrest at his residence. *Id.* at 812. During the morning hours, the officers gathered for a pre-arrest briefing where they learned that the defendant was being arrested for assaulting someone with a baton. *Id.* At the briefing, the officers learned of the defendant's criminal history,

4

which involved carrying and concealing firearms. *Id.* When the officers executed the warrant, several officers approached the front door with a protective shield at the front of their formation while other officers surrounded the residence. *Id.* After knocking on the front door, the officers heard and saw movements inside suggesting multiple occupants. *Id.* The officers repeatedly knocked and announced their presence, and the defendant did not immediately respond. *Id.* When the defendant opened the door, he was placed in handcuffs and removed to the front porch. *Id.* After the defendant acknowledged the presence of his girlfriend inside the residence, she immediately exited and advised that no one else remained inside. *Id.* Still concerned for their safety and uncertain as to whether any other persons remained inside, the officers conducted a protective sweep to look for individuals who could harm the arresting officers. *Id.* The officers searched the front living room, two adjacent rooms, and the kitchen. *Id.* at 812–13. During the sweep, the officers observed two guns, ammunition, drugs, and drug paraphernalia. *Id.* at 813.

On appeal, the Eighth Circuit found the protective sweep valid. *Id.* at 814. The Eighth Circuit acknowledged that the "[p]rotection of officers conducting an arrest near a defendant's home is a priority" recognized in the law, and protective sweeps are therefore justified—even when the arrestee and other occupants have been secured—because police officers are especially vulnerable on the "adversary's turf" given "the heightened potential for an ambush in unfamiliar surroundings." *Id.* (quoting *Buie*, 494 U.S. at 333; and *Davis*, 471 F.3d at 944). In so holding, the *Alatorre* court recognized that "the inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific." *Id.* (quotation and alteration omitted).

Turning to the specific facts of *Alatorre*, the Eighth Circuit referenced "several articulable facts and rational inferences supporting the officers' reasonable beliefs that someone else could be inside posing a danger to them during or following the arrest."

5

Case 2:24-cr-01036-CJW-MAR    Document 47    Filed 05/12/25    Page 5 of 16

*Id.* (emphases omitted). The court stated that because the defendant's criminal history involved concealing firearms, weapons "were conceivably present in the residence," which could give "anyone remaining inside the residence access to weapons to use in an ambush of the officers." *Id.* at 815. The court also noted that "audible movements and behaviors . . . of people behind the door and blinds after the officers knocked, along with the delays in answering the door, created a reasonable uncertainty as to how many people were inside the residence and their intentions toward the officers." *Id.* The court also noted that "it was easy for someone to hide just out of view of the officers inside the residence in a position from which an attack could be launched," and thus the officers were "vulnerable to attack from someone inside the residence." *Id.* at 814–15. Finally, the court observed that hindsight revealing "that the officers had already encountered all of the occupants of the home before conducting the protective sweep" was of little value. *Id.* at 815 (citing *Williams*, 577 F.3d at 881). More relevant to the court was the information available at the time the officers initiated the protective sweep. *Id.* at 814–15.

Here, defendant first takes issue with Judge Roberts' characterization that defendant "refused initial commands" in relation to defendant's conduct after the Tactical Team arrived at his residence, and that defendant's conduct "could have afforded ample time for anyone inside the residence to arm or conceal themselves." (Doc. 46, at 2); *see also* (Doc. 43, at 12). Defendant argues that he had no way of exiting his residence from upstairs—where he was located when the first command to exit the residence was given—without some delay as he proceeded downstairs, and thus the delay was inevitable, and it is "not as though anyone expected [him] to jump out a second story window" to comply with the command to exit. (Doc. 46, at 2). True, defendant did not need to immediately fling himself out the window, but the fact remains that there was indeed a delay between defendant being apprised of police presence and him exiting the residence. The concern

6

here is not whether the delay is inevitable given the layout of the house, or whether the delay was reasonable or explainable, but simply that the delay *existed*, during which time defendant remained totally unseen, and this created an opportunity for anyone who might be present to hide, arm themselves, and gain advantage over the officers while they waited to engage defendant.

Moreover, here defendant further protracted the delay beyond what was inevitable or necessary, and thus it is not true that defendant did not refuse initial commands to exit immediately. Sgt. Helton, who Judge Roberts found credible, wrote in his report and testified that he commanded defendant to exit the residence three times before defendant appeared in the upstairs window, and then, after further command, defendant appeared in the downstairs kitchen window. (Docs. 29-3, at 1; 45, at 36–37). Defendant then requested to see a warrant, and Sgt. Helton advised that he could see it after exiting empty-handed. (Docs. 29-3, at 1; 45, at 38–39).[1] In short, like *Alatorre*, here there was a delay between police officers apprising defendant of their presence and defendant answering the door, heightening the concern as to who might be in the residence and their capability to harm the officers.

Defendant focuses next on the police officers' inability to identify specific individuals, other than Haynes, who could have conceivably been present at defendant's residence when the arrest occurred. (Doc. 46, at 2–4). This critique is unavailing, however, because police officers may conduct protective sweeps "for *unknown* individuals in a house who may pose a threat to officers as they effectuate an arrest." *Alatorre*, 863 F.3d at 813 (emphasis added) (quoting *Waldner*, 425 F.3d at 517). Police officers do not need to compile a dossier on the identities of specific individuals who

---

[1] As Judge Roberts noted, this implies no criticism of defendant's request to see the warrant. Still, the fact of the delay itself (rather than the reason for it) is relevant to the analysis under *Alatorre* due to the danger that delay poses to officers.

might be hiding in a suspect's home. Here, the officers provided several articulable facts and rational inferences to support the reasonable belief that another individual could be inside defendant's residence posing a threat after defendant's arrest. Sgt. Helton testified that he knew another owner, Haynes, was associated with the residence, and that defendant's place of employment, Midwest Legacy Beef, was located immediately next door on the parcel adjacent to the residence. (Doc. 45, at 42–43). The property information attached to the arrest warrant lists Haynes as "Primary Owner (Deed Holder)" and defendant as "Secondary Owner (Contract Holder)" for the residence. (Doc. 29-2, at 8). The house is also described as having 1,692 square feet of total living area consisting of two stories with six rooms, three of which are bedrooms. (*Id.*, at 9). Given the size of the residence suggesting it was capable of accommodating multiple occupants, that defendant was not the only owner listed, and its proximity to defendant's place of employment, police officers had a reasonable uncertainty as to how many people may have been in the residence other than defendant. *See Williams*, 577 F.3d at 881 ("While hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep.").

Defendant next argues that *Alatorre* is distinguishable from this case, as are *Ruiz* and *Pruneda* (each of which Judge Roberts cited in his R&R, relying primarily on *Alatorre* and *Ruiz*), because in those cases, officers obtained indicia that other occupants were actually in the residence before conducting a protective sweep. (Doc. 46, at 4–5). In *Alatorre*, when officers knocked on the defendant's door, they heard and saw movements inside consistent with multiple occupants. 863 F.3d at 812. In *Ruiz*, officers saw two people flee to the back of the home when they knocked on the front door. 728 F. Supp. 3d at 981. And in *Pruneda*, officers were aware that at least one other individual was with the defendant in his residence at the time of arrest. 518 F.3d at 602–03. Here,

8

in contrast, police officers did not see or hear anyone else at the property prior to or during the arrest of defendant. Indeed, Trooper Remley testified that he did not see any other people on the property when they were executing the warrant and, moreover, that he did not see anything that would lead him to believe there were other people present in the home. (Doc. 45, at 101).

In *Alatorre*, as explained above, the Eighth Circuit mentioned numerous factors which were sufficient altogether to justify the protective sweep after the defendant was already arrested. Those factors were, in essence: the layout of the premises exposing officers to vulnerability; the known possibility of weapons in the residence (supported by the defendant's criminal history); observations consistent with multiple occupants; and the delay before apprehending the suspect. 863 F.3d at 814–15. The Eighth Circuit did not state whether any factor weighed more strongly relative to the others, nor did they say that all these factors were necessary to the conclusion that the search was permissible. Instead, the Eighth Circuit made clear from the outset that "the inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific." 863 F.3d at 814 (quotation and alteration omitted). Rather than require facts identical to *Alatorre* in every case, the Eighth Circuit explained that when courts analyze the facts of an arrest near a defendant's home and decide whether a protective sweep is justified, the overarching concern is the prioritization of officer safety. *Id.* (citing *Buie*, 494 U.S. at 333; and *Davis*, 471 F.3d at 944); *see also Davis*, 471 F.3d at 945 (listing six factors justifying protective sweep, three of which indicated presence of accomplices, two of which indicated danger to officer safety, and one of which indicated the heightened possibility of a surprise attack).

True, the officers here did not observe specific indicia consistent with multiple occupants actually present at defendant's home at the time of the arrest. But the policy goal of prioritizing officer safety which underpins and permits the protective sweep

9

exception, as explained by the Supreme Court and reiterated by the Eighth Circuit, *see Buie*, 494 U.S. at 333; *Davis*, 471 F.3d at 944; *Alatorre*, 863 F.3d at 814, provides a sound basis on which the Court concludes that here the sweep was justified by additional facts and circumstances, even though it is a closer call than many other cases.

First, as explained above, there was a delay before defendant opened the door after numerous commands to exit, during which anyone inside defendant's residence could have armed themselves and hidden from officers. Second, the layout of the home included multiple points of ingress and egress and, as explained above, officers had a reasonable uncertainty as to how many people may have been in the residence based on the ownership of the residence, its size, and its proximity to defendant's place of employment. The layout of the home was also such that any attacker from within the two-story home would have the high ground in the vicinity, giving them a tactical advantage and leaving the officers near the house exposed and vulnerable on a downslope. Finally, as for weapons, whereas in *Alatorre* dangerous weapons were only "conceivably present in the residence" based on the defendant's criminal history, here officers already knew for a fact that defendant had multiple long guns hanging on the wall and a military backpack inside his home.

It is worth emphasizing that the legal inquiry here is not just whether officers reasonably believed the residence harbored any individual, but whether officers reasonably believed the residence "harbored an individual *posing a danger* to the officer[s] or others." *Alatorre*, 863 F.3d at 813 (emphasis added). Although there were less indicia here than other cases that another individual was actually present in defendant's residence, the layout of the residence and the fact that officers knew multiple guns were already inside and easily accessible reasonably led officers to believe that any individual hiding in the residence could pose extreme danger to the exposed officers, especially after the delay in defendant exiting the residence. Because these facts and

10

inferences, taken together, supported the officers' reasonable belief that someone else could be inside defendant's residence posing a danger to them following defendant's arrest, the protective sweep was justified. *Id.* at 814–15.

### B. *Mistake Regarding Scope of the Search Warrant*

Next, defendant objects to Judge Roberts' conclusion that the Tactical Team's misunderstanding of the assignment, and the fact that they had already decided to make the sweep before they arrived on the scene, did not erode the validity of the search. (Doc. 46, at 6–8); *see also* (Doc. 43, at 14–16). At the suppression hearing, Sgt. Helton testified that he understood the warrant to authorize an "all-encompassing search . . . for the entire property." (Doc. 45, at 74). He understood his Tactical Team's role was to make the area secure for other investigators to follow up with a search warrant for anything the warrant authorized them to seize. (*Id.*, at 74–75). At the time of the search warrant's execution, Sgt. Helton was not aware that the only purpose authorized by the search warrant was to locate defendant and execute the arrest warrant for him. (*Id.*, at 28–29). Trooper Foley, who was part of the entry team effectuating defendant's arrest and conducting the sweep, testified that the decision to make a protective sweep was made at the morning briefing at the police station, and that the Tactical Team was going to conduct a sweep of defendant's residence after his apprehension, regardless of the circumstances. (*Id.*, at 126–28).

The officers' mistaken belief that they could conduct a protective sweep regardless of the circumstances on the scene and their predetermined intent to conduct a sweep of defendant's residence could be seen to flout the Eighth Circuit's admonition that "a protective sweep may not be conducted as a matter of course." *Williams*, 577 F.3d at 881 n.3. The inquiry, however, is an objective one, and thus it does not consider the subjective mental states of the officers on the scene and whether they intended to execute the sweep regardless of the circumstances; rather, the test asks whether the officers

11

"*reasonably* believe[d], based on specific and articulable facts, that the residence harbor[ed] an individual who could be dangerous." *Pruneda*, 518 F.3d at 603 (emphasis added). As explained above, certain facts and rational inferences from the facts indeed existed here which, taken together, are sufficient to support an objectively reasonable belief that defendant's residence harbored unknown individuals posing a danger to the officers. Had those facts been absent, the sweep would not have been legally justified if indeed the officers had still carried it out anyway, but that is not the case here.

Moreover, many of the facts that objectively supported a protective sweep here—the size, location and topography of the house, the known presence of firearms, the proximity to a place of employment—were all known to officers before they executed the arrest warrant. Thus, it was not unreasonable or unexpected that the officers preparing to execute the arrest warrant would contemplate that there would be a need to conduct a protective sweep of the premises while effectuating defendant's arrest. In that sense, the officers' predetermination that a protective sweep would be necessary does not flout the Eighth Circuit's admonition that protective sweeps not be conducted as a matter of course.

The Court echoes the Eight Circuit's caution that protective sweeps may not be conducted as a matter of course and must be justified on an individualized basis. Here, the search was objectively justified on such a basis, and thus the Court's conclusion remains unchanged. *See Williams*, 577 F.3d at 881, 881 n.3 (concluding that "the officers had the reasonable suspicion required by *Buie* in order for a protective search to come within the limits of the Fourth Amendment" even though officers at the suppression hearing described their protective sweep as "standard procedure" and a "normal practice," which the court admonished).

### C. Leon *Good Faith Exception*

Finally, defendant objects to Judge Roberts' conclusion that even if the protective sweep here was illegal, law enforcement officers nevertheless acted in good faith when

they relied upon and executed the second search warrant, which authorized them to seize the firearm and silencer in defendant's residence observed by officers during the initial sweep. (Doc. 46, at 8–10); *see also* (Doc. 43, at 17–23).

"The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011). Yet, the so-called "good faith exception" to this exclusionary rule, first announced by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 920 (1984), applies when "it was objectively reasonable for the officer executing [a] warrant to have relied in good faith on the issuing judge's determination that probable cause existed," even though that warrant is later deemed invalid. *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (citing *United States v. Jackson*, 848 F.3d 872, 878–79 (8th Cir. 2017)).

"The good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation marks and alteration omitted). In *Proell*, the Eighth Circuit explained that *Leon* identifies four situations where an officer's reliance on a warrant would be unreasonable:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (emphasis in original) (internal quotation marks omitted) (citing *Leon*, 468 U.S. at 921; and *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

Here, Deputy Schmidt was present when officers executed the first search warrant and arrested defendant outside his home. Her affidavit in support of the second warrant states, "On 07/22/2024 the Iowa State TAC team assisted by the Jackson County Sheriff's Office executed the previously issued search warrant for the location and arrest of [defendant]. [Defendant] was located inside his residence at [defendant's address]. When officers were inside the home clearing it they observed a homemade illegal rifle." (Doc. 29-4, at 4).

In his motion to suppress, defendant argued that the affidavit was misleading because it made it sound like he was apprehended and arrested inside his residence. (Doc. 29, at 7–8). In the R&R, Judge Roberts explained that under *Franks v. Delaware*, 438 U.S. 154 (1978), an affidavit in support of a search warrant is presumed valid, and in order to obtain a hearing, and ultimately a determination, on a defendant's contention that an issuing judge's probable cause determination was premised on false or omitted statements, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155–56; *see also* (Doc. 43, at 20–21). Judge Roberts concluded that even if defendant had requested a *Franks* hearing— which he did not—defendant had not shown that what he calls a "significant omission" (i.e., the timing and location of the arrest) was made knowingly and intentionally, or with reckless disregard for the truth. (Doc. 43, at 22).

In his Objection, defendant effectively concedes he is not entitled to a *Franks* hearing. (Doc. 46, at 9). He maintains, however, that officers executing the second warrant nevertheless should have known the search was illegal despite the issuance of the warrant by a judge. (*Id.*). Defendant explains that Deputy Schmidt, who authored the affidavit, along with Sheriff Kilburg together executed the second warrant, and they were

14

both part of the group of officers who were present for the execution of the first warrant and arrest of defendant. (*Id.*). They should have known, defendant argues, that the first warrant permitted a search of defendant's home and place of employment *only* to find and arrest him, rather than an "all-encompassing" search of those places even after he was arrested. (*Id.*). Because officers executing the first warrant illegally searched defendant's home by exceeding the scope of that warrant, defendant argues, the same officers executing the second warrant had to have known it was premised on items observed during that illegal initial search. (*Id.*, at 9–10).

As explained above, the initial search of defendant's residence was justified under the protective sweep exception to the Fourth Amendment's warrant requirement. Defendant's argument therefore fails on its premise, i.e., that Deputy Schmidt and Sheriff Kilburg should have known, when they executed the second warrant, that it was based on an illegal initial search. It was not. Assuming, though, that this legal conclusion as to the protective sweep is overturned on appeal and the sweep was instead illegal, the Court finds that the illegality of the sweep is far from being so obvious that Deputy Schmidt and Sheriff Kilburg should have known it, too. The Court will not impute a lack of good faith to Deputy Schmidt and Sheriff Kilburg on that basis. There has been no other showing that they did not act in objectively reasonable reliance on the issuance of the second warrant. Thus, even if the second warrant were to be deemed invalid because the protective sweep, on which that warrant was premised, was not justified, the evidence seized pursuant to that warrant need not be suppressed. *See Proell*, 485 F.3d at 430.

15

## IV. CONCLUSION

For these reasons, the Court **adopts** Judge Roberts' R&R (Doc. 43). Defendant's Objection (Doc. 46) is **overruled** and defendant's Motion to Suppress (Doc. 28) is **denied**.

**IT IS SO ORDERED** this 12th day of May, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa